IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **ANDREW GOESEL AND CHRISTINE GOESEL**, individually and as next friend to **COLE GOESEL**, a minor, | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Case No. 09 C 4595<br>) |
| **BOLEY INTERNATIONAL (H.K.) LTD.**; **BROADWAY TOYS INDUSTRIES LTD.**; **FOSHAN SHUNDE DISTRICT NA WEI PLASTIC & HARDWARE CO., LTD.**; and **TARGET CORPORATION**, | )<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

This action seeks to recover damages sustained by then five year old Cole Goesel ("Cole") when a plastic toy sword that he was playing with -- part of a toy product known as the "Boley Cosmic Robot" -- shattered and a piece of that sword pierced Cole's eye. After discovery was closed, this Court approved and entered the jointly submitted final pretrial order ("FPTO") on June 21, 2012, and the litigants adhered to the schedule provided there for the submission of motions in limine by tendering a host of such motions -- 13 by plaintiffs (cited simply "P. No. --") and 11 by defendants.

With each side having responded to the other side's motions, they are ripe for decision. This opinion will deal with plaintiffs' motions, with defendants' motions to be addressed hereafter in a separate opinion.

P. Nos. 1, 2 and 3 all relate to aspects of the proposed testimony of opinion witness[1] Bert Reiner ("Reiner"), whose CV recites:

> I have been in the toy and juvenile product industries for 35 years, developing, engineering and manufacturing toys and children's products. Since June 1988, I have been president of Reiner Associates, Inc., a company primarily engaged in Engineering and Quality Assurance consultation to these industries.

Here in summary are the aspects of Reiner's proposed testimony sought to be barred by plaintiffs' motions:

1. P. No. 1 objects to Reiner's opining on the type of plastic of which the sword that injured Cole and the sample swords tested by plaintiffs' opinion witness were manufactured.

2. P. No. 2 seeks to bar Reiner's testimony as to the reasonable foreseeability of Cole's conduct at the time of the occurrence.

3. P. No. 3 seeks to preclude Reiner's proposed testimony criticizing the manner in which plaintiffs' opinion witness conducted abuse testing of those sample swords.

As to P. No. 1, plaintiffs have submitted evidence from a highly credentialed opinion witness, Dr. Duane Priddy, who conducted a sophisticated chemical analysis that concluded the sword that shattered was manufactured from a type of plastic known as "crystal" or "general purpose" polystyrene. By contrast, nothing in Reiner's history in the toy industry gives him even the slightest of credentials to speak to that issue, thus presenting the familiar situation in which a proposed witness has credentials that would enable him or her to testify in other areas but <u>not</u> on

---

[1] See the attached Appendix.

the subject under consideration (see, e.g., DePaepe v. Gen. Motors Corp., 141 F.3d 715, 720 (7th Cir. 1998)).

Defendants' attempted response to P. No. 1 offers nothing substantive to support Reiner's testimony on a subject in which he is totally lacking in qualifications. Hence P. No. 1 is granted.

As for P. No. 2, it is a long time since Reiner was five years old -- his CV reflects that he graduated from Rensselaer Polytechnic Institute more than a half century ago. More seriously, his Fed. R. Civ. P. ("Rule") 26(a)(2)(B) report said nothing at all on the issue of foreseeability, a subject on which he later advanced an ipse dixit during his post-report deposition.[2] In that respect Reiner's background and experience are singularly deficient in any showing that would entitle him to claim "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue" (the language of Evid. R. 702(a)). Instead members of the lay jury will be able on their own to deal with the issue of foreseeability. Indeed, Reiner's willingness to reach out gratuitously beyond his own field of special knowhow appears to raise serious concerns as to his general credibility.[3]

P. No. 3 also relates to a subject beyond the scope of the Reiner written report: During his deposition he said "that he also had 'questions' regarding the manner in which Plaintiffs' expert, Timothy Pine, had conducted abuse testing of other, identical toy swords also sold by

---

[2] This Court regularly urges counsel in cases before it to read and consider the first-rate article by Gregory Joseph in the American Bar Association's Litigation magazine (Expert Approaches, 28 No. 4 Litigation 20 (Summer 2002)) in which he points out the risk involved in taking such post-report depositions. Without such a deposition, the opinion witness' testimony is circumscribed by the content of the report, while a deposition poses the risk of opening up other areas as well.

[3] This Court is not, however, employing its "gatekeeper" role at this time to raise a question as to Reiner's overall testimony as limited by the rulings in this opinion.

Defendants" (P. No. 3 at 2). But as P. No. 3, id. went on to state:

> Mr. Reiner, however, admitted at the deposition that he had not formulated a specific opinion on whether Mr. Pine's testing was consistent with the applicable requirements for such testing set forth in ASTM F-963. Further, Defendants have never supplemented Reiner's report to identify any definitive criticisms of Mr. Pine's tests.

Once again the wisdom of Greg Joseph's caveat is evident. This Court takes seriously its close of discovery orders, which it enters only when both sides have confirmed that they are through with the process -- in other words, its issuance of an FPTO is indeed "final," absent some extraordinary reason for changing the ground rules for trial that the FPTO establishes. In that regard this Court will not credit or honor the hedge that Reiner attempts to insert at the end of the "Conclusion" section of his written report:

> Be advised that this report is based on information received to date; I reserve the right to change or amend my opinion, after receipt of further information through discovery.

In sum, P. No. 3, like P. Nos. 1 and 2, is granted.

P. No. 4 seeks to bar the testimony of ophthalmologist Dr. Michael Reynard as to the causation of Cole's injuries. For that purpose plaintiffs' counsel refers to their motion, presented on May 31, in which they "requested that they be granted additional time to disclose a rebuttal expert to respond to Dr. Reynard's opinions as to the 'mechanism' or causation of Cole's injuries" (P. No. 4 at 2). Defendants' counsel initially responded this way:

> The Plaintiff misstates the representations made by counsel for Defendants regarding the opinions of Dr. Reynard related to the causation of Cole Goesel's injuries, including the opinions contained in the portion of Dr. Reynard's report entitled "Mechanism of Injury."

That criticism was totally unwarranted, and the lawyer who wrote the response should

have known it. Here was the relevant part of the May 31 transcript:

> THE COURT: But you are here now and I am going to be the one who decides it. And if it jumped off the page at me, then why do we -- why do we have to go the extra steps? It seems to me that a preliminary to even considering this motion is to get an explanation of how it is that this person is -- feels he is qualified or, more importantly, is qualified to render this kind of opinion.
>
> MS. KUNZER[4]: Exactly. You know, I think he is conceded in his written report and in his deposition that an accident reconstructionist would be needed to comment on this issue. So I think it would be appropriate to just withdraw that particular opinion as to causation because certainly he is not qualified. He is not an accident reconstructionist. He is an ophthalmologist.
>
> \* \* \*
>
> THE COURT: Well, counsel has just said that they are going to withdraw that. Right?
>
> MS. KUNZER: Just as to causation. His opinion only as to causation, not any of the other –
>
> THE COURT: No, I understand that.
>
> MS. KUNZER: -- opinions, right.

So with the issue having since been withdrawn by defense counsel (see n. 4), P. No. 4, like the others discussed to this point, is also granted.

P. No. 5 seeks to bar the admission of, and any testimony relating to, a document identified as Target Compliance & Production Services Quality Assurance Process Manual (the "Manual," D. Ex. 26). On this motion the parties are like ships that pass in the night: In part plaintiffs' counsel point out that defendants produced several different versions of the Manual,

---

[4] Attorney Amy Kunzer represented defendants at the May 31 hearing, while another lawyer -- David Gray -- signed onto defendants' original written response. That of course was no excuse for defense counsel's having charged <u>plaintiff's</u> counsel with a misstatement of defense counsel's representations. But when plaintiffs' counsel brought attorney Kunzer's statement to attorney Gray's attention, he withdrew his written objection.

each bearing a date of creation, but the earliest of those versions is dated May 2008. That was eight months <u>after</u> Cole sustained his injuries and ten months <u>after</u> the toy had been delivered to defendant Target Corporation ("Target").

But defendants' response says not a word about that. Yet for the document and related testimony to come into the case at all, there is no question that reliance must be shown, for which purpose the Manual had to antedate Target's taking on the product (relatedly, see Evid. R. 407).

On the record before this Court, then, plaintiffs' counsel are right in challenging the relevance of the Manual. For present purposes this Court has no need to consider plaintiffs' other objections, on which the parties do butt heads. P. No. 5 is also granted.

P. No. 6 asks for a missing-evidence jury instruction because codefendant Target (which sold the toy in question) did not produce its factory evaluation of Na Wei Plastic & Hardware Co., Ltd. ("Nawei"), the Chinese plant where the toy was manufactured for codefendant Boley International (H.K.) Ltd. ("Boley"). Target has a uniform and strict protocol that it follows before it purchases any product for its "Kool Toyz" line of toys from any factory:

1. It performs an investigation and evaluation of the factory.
2. It maintains a copy of the report evaluation for each factory.

In this instance Target, in response to production requests that required it to produce any evaluations of the Nawei factory, never produced any. As was the case with P. No. 4, defense counsel's response is again guilty of stretching the truth -- here is what attorney Gray says at page 2:

> In fact, the evidence reveals that any evaluations, if performed, may not have been saved or created in the first place.

But the excerpt from Target's Quality Manager Robert Stathopoulous's deposition that defense counsel Gray quoted immediately following that statement includes this answer (emphasis added):

> <u>There would have been a factory evaluation because they could not have produced without it</u>, but whether or not I have a hard copy report, I can't answer that right now.[5]

That puts the lie to the attempted "if performed" hedge as well as to the suggestion that the evaluations "may not have been . . . created in the first place."

What the issue comes down to is whether plaintiffs must show deliberate spoliation to be entitled to the requested instruction. Defendants have cited two Seventh Circuit decisions that suggest an affirmative answer to that question, while plaintiffs have proffered no authority that would indicate otherwise. There is one unanswered factual issue that might call for a ruling in plaintiffs' favor -- Stathopoulous testified that if the evaluation took place when Target had the FAS-T system (field assessment tool) in force, the evaluation would still be within that database. Because evidence on that score has not been tendered by the parties, P. No. 6 is denied.

P. No. 7 seeks to bar any testimony about insurance coverage maintained by Cole's parents that provided payment toward his medical treatment. Defense counsel unsurprisingly offers no response, given the universal caselaw supporting plaintiffs' position. Accordingly P. No. 7 is granted.

P. No. 8 seeks leave for plaintiffs' counsel to ask leading questions during the direct examination of two Target employees and of Boley's President. Again defense counsel offers no

---

[5] Astonishingly, attorney Gray has placed the "but whether . . ." clause in boldface type (perhaps in the hope that this Court might not read the language that preceded it)?

objection, and Evid. R. 611(c)(2) confirms plaintiffs' position. P. No. 8 is also granted.

P. No. 9 invokes Evid. R. 615 to call for exclusion from the courtroom of all witnesses other than the retained opinion witnesses. Defense counsel agrees that such witness exclusion should apply, but they would go further by excluding opinion witnesses as well.

Nothing tendered to this Court suggests that the presence of any of either side's opinion witnesses is "essential to the presentation of the party's cause" (Evid. R. 615(3) -- and see <u>United States v. Olofson</u>, 563 F.3d 652, 660 (7th Cir. 2009)). Hence P. No. 9 is granted as modified by defendants' response -- although if an appropriate showing of necessity as to any opinion witness is made during the next 21 days, a limited exception to this ruling may be entertained.

P. No. 10 seeks to bar any testimony or argument that Cole's actions or negligence contributed to his injuries. That motion is supported not only by the Illinois "tender years doctrine" that precludes a finding of contributory negligence on the part of a child less than seven years old but also by the absence of any assertion of contributory fault by defendants. Again unsurprisingly defendants have not responded, and P. No. 10 is granted.

P. No. 11 asks to bar admission of D. Exs. 19 - 25, which comprise testing reports prepared by Bureau Veritas on the Cosmic Robot, all of those reports having been challenged by plaintiffs' opinion witness Timothy Pine. Plaintiffs make clear that they do not seek to exclude other testing reports by Bureau Veritas that reflect the testing done pursuant to Target's toy testing protocol during the time frame that the Cosmic Robot that resulted in Cole's injuries was manufactured -- a period from March through November 2007.

Instead the challenged test reports relate to (1) a modified version of the Cosmic Robot that Boley sold to Target in the following year (2008) and (2) versions of the Cosmic Robot that

Boley sold to customers other than Target and that were tested according to protocols different from Target's. Because that first category dealt with a Cosmic Robot whose design had been changed, importantly including a change in the type of plastic from which the sword was made, plaintiffs clearly have the better of that dispute. And because each customer other than Target used its own protocol to be performed by Bureau Veritas, plaintiffs win on that issue as well. In sum, P. No. 11 is granted.

P. No. 12 asks that one of Cole's parents be allowed to accompany him on the witness stand when he testifies at trial. Coles's 10th birthday was on September 18, 2012. Once again defendants have interposed no objection to the requests, so P. No. 12 is granted.

Finally, P. No. 13 seeks the exclusion of D. Ex. 27, a document entitled "Typical Properties of BC's PS Resin." Here too defense counsel has interposed no objection, so P. No. 13 is granted too.

### Conclusion

In summary, P. Nos. 1 (Dkt. 113), 2 (Dkt. 114), 3 (Dkt. 124), 4 (Dkt. 115), 5 (Dkt. 116), 7 (Dkt. 118), 8 (Dkt. 125), 9 as modified (Dkt. 119), 10 (Dkt. 120), 11 (Dkt. 121), 12 (Dkt. 122) and 13 (Dkt. 123) are granted, while P No. 6 (Dkt. 117) is denied. As stated at the outset of this opinion, this Court will address defendants' motions in limine in a separate opinion.

_____
Milton I. Shadur
Senior United States District Judge

Date: October 24, 2012

## Appendix

This Court does not permit the label "expert witness" to be used in its trials, nor does that label appear in its opinions. That stance is <u>not</u> a mere idiosyncracy, and this Appendix -- attached to the memorandum opinion and order in this case -- explains why.

It fell to this Court's lot, as a member of the Advisory Committee on the Rules of Evidence that had been reconstituted by then Chief Justice William Rehnquist after a two decade hiatus, to chair the subcommittee responsible for the drafting of revised Fed. R. Evid. ("Evid. R.") 701, 702 and 703 and the accompanying Advisory Committee Notes ("Notes"). In that capacity this Court, together with the Advisory Committee's brilliant reporter Professor Dan Capra, wielded the laboring oar in the drafting of those Rules and Notes -- and in doing so we made sure that the Note concluded by drawing upon and quoting from an article in F.R.D. by the late District Judge Charles Richey that highlighted the anomaly of instructing a jury that it has heard testimony from an "expert" but that its members (a lay jury) need not credit that testimony -- a notion at odds with the normal understanding of the word "expert."

Why then did the Advisory Committee not change the language of the Rules and Notes to eliminate the term "expert" from their lexicography entirely? Although the Advisory Committee actively discussed that possibility, the ultimate consensus was that it could create confusion, perhaps consternation, within the profession -- a sort of manifestation of the old saying that "old habits die hard" -- and that what was most important was the major substantive revision of the Rules and Notes rather than a change in vocabulary, so long as the lay jury was not exposed to the risk identified by Judge Richey. It is noteworthy that both Civil Instruction 1.21 and Criminal Instruction 3.07 of the Committee-generated pattern instructions for use in the Seventh Circuit have eschewed any mention of the word "expert."

One added comment is in order as to the history of the Rules and Notes discussed here. It is well known that the seminal decision in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993) inspired the revision of Evid. R. 702 and its related companions, so that there is a tendency to cite Daubert as having established the relevant criteria for the admissibility or inadmissibility of opinion testimony. But our Advisory Committee wished to make the point that all of the Daubert-identified factors are not essential to admissibility (for example, peer review would not play a role where the opinion witness' testimony was based on that witness' practical experience). Hence our draft of proposed Evid. R. 702 was framed in terms of Daubert not setting the exclusive standards for admissibility.

As chance would have it, that draft had been approved by the umbrella Standing Committee of the Judicial Conference to authorize its circulation for public comment at the time that the Supreme Court decided Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999) -- and the Kumho opinion, id. at 156-57 actually cited our Committee Note to the proposed Evid. R. 702 amendment. Consequently our Committee made sure that the ultimate Note to the year 2000 amendment to Evid. R. 702 in turn cited to Kumho, which should really be given equal footing with Daubert in terms of the definitive standards.